# RICHARD PALMA
**ATTORNEY AT LAW**
**225 BROADWAY- SUITE 715**
**NEW YORK, NEW YORK 10007**

MEMBER OF THE BAR                                      TEL. (212) 686-8111
NEW YORK                                               E-MAIL - rpalma177@gmail.com

July 25, 2025

**ECF**

The Honorable LaShann DeArcy Hall, U.S.D.J.
United States District Court
Eastern District of New York
225 Cadman Plaza East, Courtroom 4GN
Brooklyn, New York 11201

> Re:    United States v. Juan Amaya-Ramirez, 20 CR 228 (S2)-04 (LDH)
>        Amaya-Ramirez Requests a Sentence of 360 Months Incarceration.

Dear Judge DeArcy Hall:

I represent Juan Amaya-Ramirez, who is scheduled to be sentenced at 11 a.m. on August 26, 2025, and I submit this letter to aid the Court in fashioning an appropriate sentence that is fair to both Amaya-Ramirez and the Government.  For the reasons set forth below, I respectfully request that the Court impose a bottom-of-the-stipulated-sentencing range sentence of 360 months on the-then-20-year-old first offender.  See Rule 11 (c)(1)(C) Plea Agreement, at ¶ 3; February 28, 2025 Order (accepting plea).

A.    Background

On September 6, 2024, Amaya-Ramirez pleaded guilty before Magistrate Judge Marutollo pursuant to a plea agreement executed that same day to Counts Six through Nine of a 48-count second superseding indictment, all the counts in which he was charged, save Count Ten.  Count Six charged that, in April 2018, Amaya-Ramirez abetted cyberstalking of Andy Peralta that resulted in Peralta's April 23, 2018 death, in violation of 18 U.S.C. §§ 2261A(2); 2261(b)(1-3, 5).  PSR, at ¶¶ 1, 2.  Count Seven charged conspiracy to murder Peralta in aid of racketeering during the same period, in violation of 18 U.S.C. §§ 1959(a)(5).  Id., at ¶¶ 1, 3. Count Eight charged that Amaya-Ramirez inflicted serious injury upon Peralta by assaulting him with a dangerous weapon in aid of racketeering, in violation of 18 U.S.C. §§ 1959(a)(6) and New York law.  Id., at ¶¶ 1, 4.  Count Nine charged that Amaya-Ramirez committed the crimes charged in Count Eight for the purpose of gaining admission to MS-13, in violation of 18 U.S.C. §§ 1959(a)(3).  Id., at ¶¶ 1, 5.

**Page 2**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

B.      The Presentence Report and the Sentencing Recommendation

Amaya-Ramirez begins with a U.S.S.G. §2A1.1(a)(1) base offense level of 43.  PSR, at ¶¶ 63, 93.   On the factually unsupported rationale that it was he who solicited his then-16-year-old girlfriend, codefendant Leyla Carranza, to lure the victim to the crime scene, the Probation Department recommends a two-level enhancement pursuant to § 3B1.4.  PSR, at ¶¶ 63, 96.  On the similarly unsupported rationale that Amaya-Ramirez destroyed the victim's phone "to erase evidence of [the victim's] communication with Carranza," it also recommends a two-level §3C1.1 adjustment for obstructing justice. Id. at ¶¶ 63, 88, 97.  Because he promptly accepted responsibility for his crimes, the Probation Department recommended a 3-level §3E1.1(a, b) reduction. PSR at ¶¶ 89, 100-01.  Thus, according to the Probation Department's calculations, Amaya-Ramirez total offense level is 43 and, this being his first offense, his Criminal History Category is 1. PSR at ¶¶ 102-05, 146.  While Probation looked at the guidelines in concluding that life was the appropriate term to impose on a then-20-year-old first offender, the parties' Rule 11(c)(1)(C) plea agreement stipulated to a guideline range of 360-months to life imprisonment, albeit on the Government's factually unfounded belief that the two enhancements summing four levels applied. Plea Agreement at ¶¶ 3-4.


C.      Mr. Amaya's Factual Objections To The PSR

Sentencing judges necessarily have "discretion to draw conclusions about the testimony given and evidence introduced at sentencing," but "due process requires that sentencing determinations be based on reliable evidence, not speculation or unfounded allegations." United States v. Bradley, 628 F.3d 394, 400 (7th Cir. 2010); United States v. Dominguez, 109 F.3d 675, 676 (11th Cir. 1997).  Neither is a district court permitted to rely upon a false or undeveloped assumption in applying the § 3553(a) factors.  United States v. Halliday, 672 F.3d 462 (7th Cir. 2012).  The threshold for accuracy is that the information has "sufficient indicia of reliability to support its probable accuracy." U.S.S.G. § 6A1.3(a); United States v. Ibanez, 924 F.2d 427, 429 (2d Cir. 1991); United States v. Bradley, 628 F.3d 394, 400 (7th Cir. 2010).


Federal Rule of Criminal Procedure 32(3)(i)(3) speaks to district court factfinding in the sentencing context.  It permits the Court to accept any undisputed portion of the PSR as a fact, Fed. R. Crim. P. 32(3)(i)(3)(A), and, where it will affect the sentence, requires the Court to resolve, by hearing or otherwise, any disputed portion of the presentence report, Fed. R. Crim. P. 32(3)(i)(3)(B).

The Sentencing Reform Act requires a district court to calculate and consider a defendant's Guidelines range in every case. Hughes v. United States, 584 U.S. 675 (2018)(citing 18 U.S.C. § 3553(a)). Even post-Booker, a district court still "must consult those Guidelines and take them into account when sentencing." Id.  A sentence imposed pursuant to a Type–C agreement is no exception to the general rule that a defendant's Guidelines range is both the starting point and a basis for his ultimate sentence. Although in a Type–C agreement the Government and the defendant may agree to a specific sentence, that bargain is contingent on the

RICHARD PALMA
ATTORNEY AT LAW

**Page 3**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

district court accepting the agreement and its stipulated sentence. Hughes, 584 U.S. 687. The Sentencing Guidelines prohibit district courts from accepting Type–C agreements without first evaluating the recommended sentence in light of the defendant's Guidelines range. USSG § 6B1.2(c).

Mr. Amaya chose to plead guilty but, given its "awesome advantages in bargaining power", United States v. Rivera, 115 F.4th 141, 146 (2d Dep. 2024), was obligated to submit to the Government's terms. Amaya-Ramirez does not dispute the stipulated sentence range. However, because he seeks to be sentenced solely for his own offense conduct and not for what the Government, despite an absence of persuasive evidence, might believe he did, he does dispute certain facts upon which the Government estimated his adjusted offense level. See Plea Agreement, at ¶ 4.

1. <u>Where The Government Adduced Testimony From Its Own Cooperator That It Was Flores-Mejia Who Recruited Leyla Carranza To Lure Andy Peralta Into The Park And Amaya-Ramirez Did No More Than Acquiesce In A Decision His Girlfriend Made On Her Own, Amaya-Ramirez Objects To The Factual Assertion That It Was He Who Engineered Carranza's Participation.</u>

U.S.S.G. § 3B1.4 provides a 2-level offense level enhancement "[i]f the defendant used or attempted to use a person less than eighteen years of age to commit the offense or assist in avoiding detection of, or apprehension for, the offense, increase by. "Used or attempted to use" includes directing, commanding, encouraging, intimidating, counseling, training, procuring, recruiting, or soliciting." Application Note 1.

Echoing the Plea Agreement's estimation, the Probation Department recommends a 2-level § 3B1.4 enhancement because "Amaya-Ramirez used Carranza, who was a minor at the time the offense was committed, to commit the instant offense by soliciting her to communicate with Peralta to lure him to the location where he would ultimately be murdered, under USSG is warranted." PSR, at ¶ 63. The evidence makes clear, however, that it was Flores-Mejia who first "solicited" and "recruited" Carranza's participation in the offense and that it was he alone who thereafter "directed" and "encouraged" Carranza's activities. Application Note 1 to § 3B1.4.

a. <u>Jose Daniel Lazo-Villa Absolves Amaya-Ramirez of All *Factual* Responsibility for Leyla's Recruitment.</u>

Summoned by the Government, coconspirator Jose Daniel Lazo-Villa testified at Carranza's February 25, 2025 *Fatico* hearing that Flores-Mejia, who had murdered before, was the chief motivator of Andy Peralta's murder. Ex. A, JLV-29, at 1  As acknowledged in the Government's April 7, 2025 sentencing submission, it was Flores-Mejia who circulated the offending video in which Peralta is seen flashing the signs of a rival gang, conceived the idea to murder Peralta, recruited first Lazo-Villa, then Carranza and finally Amaya-Ramirez, masterminded the plot, and pushed the plan to fruition by manipulating his accomplices to

RICHARD PALMA
ATTORNEY AT LAW

**Page 4**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

achieve his homicidal objective that they may not have shared. F. 42-44, 96; GX 8.  Carranza and Lazo-Villa were Flores-Mejia's high school freshman classmates and met 24 months before the murder. F. 29; Ex B, JLV-23, at 1.   Leyla was close with the pair and had had simultaneous sexual relations with both well before she even met Amaya-Ramirez.  F. 31, 33, 95-96, 98-100; Ex. B JLV-23, at 2; Ex. A, JLV-29, at 1.

Regarding the propriety of the § 3B1.4 enhancement, Lazo-Villa absolved Amaya-Ramirez of responsibility for soliciting Leyla Carranza:

> Lazo-Villa:  "…I remember that *[Flores-Mejia]* told Leyla: Oh, *I need you* to *do me* a favor, a favor.
> … right before she gave an answer, I remember that Flores-Mejia asked Juan if there would be any problem with her helping her -- helping us out. And I remember that Juan said no, that *if she wanted* to help us, there would be no problem.

F. 48 (emphasis added).  See also Ex. B, JLV-23, at 2.

> AUSA Moore:  And did she reach out to Andy?
> Lazo-Villa: Yes, I remember that she sent him a request right in front of us.

F. 49

> Q.  Isn't it true that Flores-Mejia specifically asked Leyla to help lure Peralta out to the park?
> A.  Yes.
> Q.  He didn't ask Juan's permission for anything, he just asked her; isn't that right?
> A.  No. First he asked her, but then he asked Juan if it was going to be a problem or if there was any problem with her helping us.

F. 113.

Asking for a favor *for himself*, Flores-Mejia recruited Carranza directly. F. 48.  Far from "solicitation," Amaya-Ramirez did no more than defer to Carranza, acquiescing to her autonomous decision to help.  Id. at 49.  Noteworthy is that Carranza herself showed her boyfriend no deference when she immediately contacted Peralta, without consulting Amaya-Ramirez.  Id.  Also apparent is that Amaya-Ramirez had no advance knowledge of his co-defendants' overture to Carranza. Flores-Mejia and Lazo-Villa had been discussing Peralta and the plan to punish him for months, but it was not until that day in the park on which Flores-Mejia first showed Carranza the video that she was recruited by him. F. 42-49.  See also PSR, at ¶ 20 ("Flores-Mejia suggested that they should find someone to lure Peralta to a park where they could attack him.")  Thereafter, of course, it was Flores-Mejia, not Amaya-Ramirez, who issued detailed instructions to Carranza on precisely how she should seduce Peralta.  F. 48-50, 113.

Lazo-Villa's description of the fatal afternoon's events confirms that Amaya-Ramirez's preference was that the woman then carrying their child be far from the crime scene.  Amaya-Ramirez distanced Carranza from the violence, handing her his keys so that she could wait in his car.  F. 56-57, 125; Ex. C, JLV-8, at 7; PSR, at ¶ 22.

RICHARD PALMA<br>ATTORNEY AT LAW

**Page 5**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

2.   <u>Where It Embraced Testimony From The Government Own Cooperator Establishing That Carranza Alone Confiscated Andy Peralta's Phone Before His Murderers Even Revealed Themselves And That It Was Carranza Who Erased Her Communications With Peralta As She Waited Alone With The Phone During The Hour The Boys Were Assaulting Peralta, Amaya- Ramirez Objects To Probation's Conclusion That It Was He Who Destroyed Peralta's Phone And That His Motivation Was To Conceal Evidence of Carranza's Participation.</u>

U.S.S.G. § 3C1.1. provides that a 2-level offense level enhancement should be applied if (1) the defendant wilfully attempted to impede, the administration of justice with respect to the investigation, prosecution, or sentencing of the instant offense of conviction, *and (2) the obstructive conduct related to (A) the defendant's offense of conviction and any relevant conduct*.

The Probation Department recommends a 2-level § 3C1.1 enhancement because "Amaya-Ramirez destroyed Peralta's phone to erase evidence of *his* (presumably Peralta's) communication with Carranza." PSR, at ¶ 63. However, as Probation itself observed, Carranza herself conceded and the Court ultimately concluded at her *Fatico* hearing, it was Carranza alone who thought to confiscate Peralta's phone, and she alone deleted her communications with Peralta. PSR, at ¶ 81 ("As Carranza took Peralta's phone, deleted messages between herself and Peralta, and ultimately destroyed Peralta's phone, Carranza wilfully obstructed…."); F. 118, 121-22, 127-28. According to Lazo-Villa, the stunned killers were not even aware until they returned to the car that Carranza had confiscated the phone.[1]  The contradictions in his *Fatico* testimony notwithstanding, an FBI agent's notes of Lazo-Villa's September 23, 2020 proffer further supported the conclusion that Carranza alone actually smashed the phone. See F. 123 ("Carranza broke the phone and threw it in a reservoir in Kissena Park"); Ex. B, JLV-23, at 2  ("Leyla brought Andy's phone to the car.  They broke it and threw it in a storm drain.  Leyla was there for that as well.") The weight of the concededly conflicting evidence supports the conclusion that Carranza herself destroyed the phone.  Even were the Court prepared to conclude that Amaya-Ramirez played some role in the phone's destruction, where his supposed obstructive rationale was to conceal evidence of Carranza's communications with Peralta, communications that he then knew Carranza herself had already deleted, any *post-hoc* action Amaya-Ramirez may have taken did not rise to the level of wilful obstruction.  After all, the males had abandoned Peralta without giving a thought to his phone.

---

[1] The Court: Who had his phone at the time that [Andy asked for it]?
The Witness: Well, so, at that moment, I did not know that Leyla had it. Later on, she told us that she did.  F. 57.
Q And what, if anything, did you all do with Andy's phone?
Lazo-Villa: Well, I remember that *when we came back to reality* [in the car], she told us that she had his phone. So, we went to the other side of the park and Juan and Flores-Mejia took it and we threw it down a drain. F. 64 (emphasis added).

**Page 6**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

While the Defense is bound by the plea agreement's 2-level enhancement for soliciting a minor, our argument above is not intended to breach it but is intended to present all facts surrounding Amaya-Ramirez's participation in the crime. See, 18 U.S.C. §3661. The plea agreement, however, does allow the Defense to argue against the 2-level enhancement for obstruction. Were the Court to find the recommended enhancements unwarranted, Amaya-Ramirez's true offense level would be reduced to 43, which, minus the three § 3E1.1(a, b) levels for accepting a minimum 30-year sentence, would yield a guideline range of 292-365 months, suggesting that the conceded 30-year term was likely more than sufficient to satisfy all statutory purposes.

3. <u>There Is No Evidence That Amaya-Ramirez Bragged Of The Boys' Crime.</u>

Paragraph 26 of the PSR reports that "Amaya-Ramirez bragged to numerous other members of MS-13 about the murder and would show off the photo of Peralta's dead body." Lazo-Villa made no such claim and there is no other evidence that Amaya-Ramirez "bragged" about his role in Peralta's demise.

The Government now concedes that "brag" is their own characterization of their evidence of the interactions. After the crime, Flores-Mejia swore his confederates to secrecy, upon pain of death. Ex. D, JLV-11 at 5. In the belief that "things were about to get ugly", Flores-Mejia then fled to El Salvador. With him went his confederates only extant connection to MS-13. Ex. D, JLV-11 at 6. Neither Lazo-Villa nor Amaya-Ramirez had ever heard of the Los Indios clique (*Indios Locos Salvatruhes*, herein after "ILS") until long after the murder. Ex. C, JLV-8 at 3, 8, 16.

4. <u>While Flores-Mejia Encouraged Further Murder, Amaya-Ramirez Was Not Expected To Participate</u>.

Paragraph 27 of the PSR reports that "At some point after the murder of Peralta, Flores-Mejia, Amaya-Ramirez and Individual-1 planned to murder another individual, who had claimed to be a member of 18th Street, but they ultimately did not follow through with their plan." In Ex. E, JLV-14, Lazo-Villa explained that, while Amaya-Ramirez might have been aware of it, it was Flores-Mejia who pressured Lazo-Villa to do solo violence. When neither Flores-Mejia, nor the gainfully employed Amaya-Ramirez showed up, Lazo-Villa abandoned his effort. In the absence of his support, any claimed consequences for failure to fulfill Flores-Mejia's purported expectations, or any further follow-through, the claim is clearly unworthy of any credibility.

**Page 7**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

D. <u>The § 3553 Factors, Recently Recognized Flaws in Adolescent Reasoning and Conditions of Confinement Currently Anticipated to be Much Harsher Than Those to Which Adult Defendants Have Historically Been Subject, Militate for a Sentence at The Bottom of The Stipulated Sentencing Range.</u>

Congress has counselled that "[t]he court should impose a sentence sufficient, but not greater than necessary, to comply with the statutory purposes of sentencing. U.S.S.G. Chapter 5, Part A, Introductory Commentary citing 18 U.S.C. § 3553(a).  Nevertheless, "[t]he United States is believed to be the world's leader in incarceration, spending $80 billion a year to keep more than two million people behind bars." Zolan Kanno-Youngs and Maura Turcotte, *Thousands of Prisoners Were Sent Home Because of Covid. They Don't Want to Go Back*, The NY Times (June 27, 2021).

 In calculating a sufficiently punitive sentence, a sentencing judge must have a "generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." <u>United States v. Singh</u>, 877 F.3d 107, 121 (2017) (quoting Guido Calabresi, What Makes a Judge Great: To A. Leon Higginbotham, Jr., 142 U. Pa. L. Rev. 513, 513 (1993); see also Edward J. Devitt, Ten Commandments for the New Judge, 65 A.B.A. J. 574 (1979), reprinted in 82 F.R.D. 209, 209 (1979) ("Be kind. If we judges could possess but one attribute, it should be a kind and understanding heart. The bench is no place for cruel or callous people regardless of their other qualities and abilities. There is no burden more onerous than imposing sentence in criminal cases.").  "It has been uniform and constant in the federal judicial tradition for the sentencing judge to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue." <u>Pepper v. United States</u>, 562  U.S. 476, 487-88 (2011) (quoting <u>Koon v. United States</u>, 518 U.S. 81, 113 (1996)).  The punishment should fit the offender and not merely the crime.  <u>Pepper v. United States</u>, <u>supra</u> (citing <u>Williams</u>, 337 U.S. at 247 (1949)).

> Imposing a sentence on a fellow human being is a formidable responsibility. It requires a court to consider, with great care and sensitivity, a large complex of facts and factors. The notion that this complicated analysis, and moral responsibility, can be reduced to the mechanical adding up of a small set of numbers artificially assigned to a few arbitrarily-selected variables wars with common sense. Whereas apples and oranges may have but a few salient qualities, human beings in their interactions with society are too complicated to be treated like commodities, and the attempt to do so can only lead to bizarre results.

<u>United States v. Gupta</u>, 904 F. Supp. 2d 349, 350 (2012) (Rakoff, J.) (emphasis added).

1. <u>The Nature and Circumstances of the Offense.</u>

Flores-Mejia, who was already a member, introduced Lazo-Villa to MS-13 when they met as high school freshmen.  It became the boys' ambition to be the founders of their own clique, which Flores-Mejia would head. Ex. C, JLV-8 at 2-3: Ex. D, JLV-11 at 2.  Together they

RICHARD PALMA
ATTORNEY AT LAW

**Page 8**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

and other MS-13 wannabes beat a fellow student who belonged to the 18th Street gang. Ex. C, JLV-8 at 1-2. The beating resulted in their suspension from school. Id.

Flores-Mejia conceived the plan to murder Peralta to raise his MS-13 profile. Ex. C, JLV-8 at 1-2. When Amaya-Ramirez began dating Carranza, their classmate, he became closer with the two boys. Once Carranza committed to their plan, Amaya-Ramirez felt obligated to support and protect her.

The four offenses of conviction are, concededly, among the most serious in Title 18 but they are all grounded in that single homicidal outcome. 18 U.S.C. § 3553(a)(1). The murder was Amaya-Ramirez's first violent act. At its conclusion, he was in shock. While Lazo-Villa did claim that Amaya Ramirez exploited the murder on both of their behalf's *post hoc* with ILS, there was a gap of 18 months between the April 23, 2018 murder and Amaya-Ramirez's October 28, 2019 arrest yet there is no suggestion that Amaya-Ramirez engaged in any further violence. See PSR, at ¶¶ 103-107 (no arrest record). In fact, Lazo-Villa said that Amaya-Ramirez was a "no show" on several occasions when Lazo-Villa had planned to commit other violence. Ex. E, JLV-14 at 3. Amaya-Ramirez chose to work overtime instead.

a. <u>His Youth Played a Significant Role in Amaya-Ramirez's Involvement</u>.

As the Sentencing Commission acknowledged in U.S.S.G. § 5H1.1, a sentencer must have the ability to consider the "mitigating qualities of youth." <u>Johnson v. Texas</u>, 509 U.S. 350, 367 (1993), and here mitigating circumstances abound. Chief among them, eclipsing even the horrifying circumstances of Amaya-Ramirez's upbringing, see PSR, at ¶¶ 114-16, 118, 122, discussed <u>infra</u>, is the obvious role his youth played in his accession to Flores-Mejia's macabre plot.

The human brain does not reach full maturity until the mid to late 20's with the prefrontal cortex- responsible for executive functions like decision-making, impulse control, and reasoning – being one of the last regions to mature. Arain, et al., *Maturation of the adolescent brain*, (April 2013). (https://pmc.ncbi.nlm.nih.gov/articles/PMC3621648/) (last visited April 23, 2025). Thus, "youth is more than a chronological fact." <u>Eddings v. Oklahoma</u>, 455 U.S. 104, 115 (1982). It is a time of immaturity, irresponsibility, "impetuousness[,] and recklessness." <u>Johnson v. Texas</u>, 509 U.S. 350, 368 (1993). It is a moment and "condition of life when a person may be most susceptible to influence and to psychological damage." <u>Eddings</u>, 455 U.S., at 115. And, most significant to those being asked to impose lengthy sentences, *its "signature qualities" are all "transient."* <u>Johnson</u>, 509 U.S., at 368 (emphasis added).

<u>Roper v. Simmons</u>, 543 U.S. 551 (2005), holding that the Eighth Amendment forbids capital punishment for children and <u>Graham v. Florida</u>, 560 U.S. 48 (2010), which likened life without parole for juveniles to that ultimate punishment, establish that, for sentencing purposes, children are constitutionally different from adults. *They "are more vulnerable ... to negative influences and outside pressures*," including from their family and peers; they have limited "control over their own environment" *and lack the ability to extricate themselves from horrific,*

RICHARD PALMA<br/>ATTORNEY AT LAW

Page 9
Letter to Hon. DeArcy Hall, USDJ
July 25, 2025

*crime-producing settings*. <u>Miller v. Alabama</u>, 567 U.S. 460 (2012) (citing <u>Roper</u>, 543 U.S., at 569)(emphasis added). And because a child's character is not as "well formed" as an adult's, his traits are "less fixed" and his actions are less likely to be "evidence of irretrievable depravity." <u>Id.</u>, at 570(cleaned up). *Roper* and *Graham* emphasized that the distinctive attributes of youth diminish the penological justifications for imposing the harshest sentences on juvenile offenders, even when they commit terrible crimes.

Here, the Government's own facts support this science. According to the FBI, "[MS-13] perpetrate[s] violence—from assaults to homicides, using firearms, machetes, or blunt objects—to intimidate rival gangs, law enforcement, and the general public. *They often target middle and high school students for recruitment." The FBI, The MS-13 Threat, A National Assessment* ( January 14, 2008)(emphasis added) https://archives.fbi.gov/archives/news/stories/2008/january/ms13_011408



Lazo-Villa's testimony demonstrated the critical roles immaturity, impulsivity and inability to resist Flores-Mejia's demonic driving influence played in Peralta's death. See F. 45-50 (recounting Flores-Mejia's murderous obsession). In the belief that membership conferred "respect," Lazo-Villa misled his friends about his relationship with MS-13, claiming that he had withstood its brutal initiation ritual and been officially inducted. F. 94-95. As their perverse adolescent puffery came closer to fruition, however, any enthusiasm for gangsterism on the part of Flores-Mejia's male confederates' waned. Inferring that he had theretofore dismissed Flores-Mejia's prior murderous musings as mere idle adolescent chatter, Lazo-Villa attributed his eventual agreement to murder to being under the influence of marijuana.[3] For his part, the previously nonviolent Amaya-Ramirez explained his involvement as motivated by his unwillingness to undermine Carranza's choice to participate. Ex. G, Mitigation Report. In the end, whether due to marijuana, fear of the knife-wielding Flores-Mejia's claimed MS-13

---

[3] AUSA Moore: Who was in the car when Flores-Mejia said: We need to off him.
Lazo-Villa: Juan was there, he was driving; Leyla was next to him; and I was in the back with Flores-Mejia.
Q. And what happened after Flores-Mejia said: We need to off him.
A. Well, I felt that the question was a little more serious. And *since I had been smoking, I told him yes.* F.46 (emphasis added).

**Page 10**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

affiliation, or loyalty to Carranza, when Flores-Mejia's dictated something, Amaya-Ramirez had not the wherewithal to resist. F. 23, 93.

> I remember that Leyla said that [Flores-Mejia] had said that it was going to be on Saturday. So, we agreed on that day. And I remember that I worked that day because we had agreed that it would be on a Saturday. So, that Saturday, *I came back from work and I was thinking about it. But then as I was thinking about it, I thought: Well, I'm already in it, so I have no other choice, I just have to go.* So, I went out to 108th and I met up with Flores-Mejia.

F. 54 (emphasis added).

Lazo-Villa proffered that the crime was supposed to be only a beating. Ex. C, JLV-8 at 6. Flores-Mejia ordered he and Amaya-Ramirez to beat Peralta but when, after most of an hour, the boys had exhausted themselves in the effort and Peralta remained alive, Flores-Mejia finished the job by jumping on Peralta's face with both feet, stabbing him and scraping the tattoo from his chest. Ex. C, JLV-8 at 6. Flores-Mejia then told them where to hide the body. Id.

The time it took to complete the crime and the absence of weapons or any other preparation chief among them, F. 58[4], there are many reasons to believe that neither Lazo-Villa nor Amaya-Ramirez actually expected Flores-Mejia to fully follow through. Lazo-Villa was not anticipating drawing blood; it was Flores-Mejia who directed that he and Amaya-Ramirez bring a change of clothes. F. 23, 124. Flores-Mejia bought them all gloves. F. 54. As they waited in ambush, it was Flores-Mejia who led them out of hiding, insisting that they not let Peralta get away. F. 55-56. It was Flores-Mejia who ordered Lazo-Villa to play the video as he removed Peralta's shirt and grilled Peralta about the 18th St. gang. F. 57-58, 125, 130. When Peralta's denials of any gang affiliation presented the possibility that his ambushers could not justify violence, it was Flores-Mejia who ordered the boys to assault him anyway. F. 58-59, 130.

Unbeknownst to the others, Flores-Mejia alone brought a knife. T. 58, 60-61,[5] 124. When their joint activities failed to achieve his desired result, see Gov't Memo at 5 ("They all beat him until they got tired. When Peralta tried to get up, they began beating him again until they again were tired."), Flores-Mejia took matters into his own hands. While the Government argues that it was Mr. Amaya-Rodriguez "who ultimately choked Peralta to death," Gov't Memo at 1, Lazo-Villa testified that it was because Peralta was still able to scream after Mr. Amaya-Ramirez's seemingly half-hearted attempts at choking him, that Flores-Mejia filled Peralta's mouth with dirt and pushed events past the point of no return by producing the knife and stabbing Peralta. T. 59-60, 105-06, 109-110. Lazo-Villa, too, used weapons, the knife and a stick, but not Amaya-Rodriguez, who never acted so purposefully. T. 60-61.

---

[4] AUSA Moore: Had you all come armed with weapons?
Lazo-Villa: No, no, it was just Flores-Mejia who had, like, a kitchen knife. And I took a stick, like the branch of a tree that was there. F. 58.
[5] The Court: So, you had not seen the knife at the park before then?
Lazo-Villa: No. F. 61.

**Page 11**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

Lazo-Villa confessed that, when they returned to the car, the boys were in shock at what they had done.[6]

Ignoring that it was Flores-Mejia who recovered his senses and sought to memorialize his dastardly deed, Flores-Mejia alone who retained the wherewithal to command his shellshocked cohorts to use his phone to photograph themselves posing with his "trophy" and Flores-Mejia who shared the photo with instructions to destroy it, F. 61[7]; Ex. C, JLV-8 at 7, yet the Government argues disingenuously in support of a sentence twice that possible in a New York State prosecution that it was Amaya-Ramirez who "appeared to take the greatest pride in the murder." Gov't Memo at 1

The Government condemns Amaya-Ramirez for doing "nothing to move away from the gang" but the truth is that, after Flores-Mejia fled, neither Amaya-Ramirez nor Lazo-Villa had any remaining connection to MS-13. It was only months after the murder that Amaya-Ramirez learned of the ILS clique. The truth is that MS-13 is endemic in the Salvadoran community in New York. Considering this fact, and further that Flores-Mejia's preached that the penalty for disassociation with the gang was death is entirely accurate, see e.g. Oliva v. Lynch, 807 F.3d 53, 56 (4th Cir. 2015) ("MS–13 forbids its members from quitting and kills anyone who attempts to leave the gang."), we ask the Court to consider the consequences to Amaya-Ramirez had he been seen as betraying MS-13. Martinez v. Holder, 740 F.3d 902, 907 (4th Cir. 2014). (Martinez was beaten when he failed to attend the weekly meetings at which MS–13 leaders informed the membership who had the "green light," which member was to be executed. A principal reason for being green lit was attempting to leave MS–13. Two friends of Martinez who tried were killed. At age 16, tired of the beatings he had received for disobedience, Martinez decided to leave and stopped attending its meetings. Several weeks later, he encountered his local leader, "Psycho," and said he wanted out. Psycho said there was "only one way to get out." When Martinez insisted that he was quitting, members beat and stabbed him, leaving him for dead.)

Albeit in circumstances where compassion is less consequential, the Government itself has acknowledged the Hobson's choice facing young Hispanic males whose families have fled Central America in search of safe harbor from tyranny and lawlessness for themselves and their offspring. Vulnerable, in a new country with virtually no social networks, minors who migrate to the United States are easy prey for gangs like the MS-13. Despite being widely exploited as non-union labor, immigrants are nevertheless vilified on Long Island as little more than vermin. "Transnational criminal street gangs like MS-13 serve only to terrorize our communities and prey upon our most vulnerable youth who are often left with little choice–join the gang or face the consequence," said Peter Fitzhugh, Special Agent-in-Charge of New York's Homeland Security Investigations. "This unfair choice ends one of two ways, jail or death." U.S.A.O., E.D.N.Y., *MS-13 Gang Associate Indicted for Murder of 17-Year Old Victim in Kissena Park in*

---

[6] See n.2, *supra*; Ex. D, JLV-11 at 5; Ex. B, JLV-23, at 2.

[7] A. So, since we saw that he was not reacting anymore, we were going to leave. And then I remember that *Flores-Mejia said we were missing a photo*, so then we went back and we took a photo of ourselves.
Q. What were you doing in the photo?
A. Well, we were all flashing MS signs. I was flashing an MS sign *with the knife*. So, Flores-Mejia was also flashing MS and so was Juan. F. 61.

**Page 12**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

*Queens,* Press Release (March 26, 2021) (https://www.justice.gov/usao-edny/pr/ms-13-gang-associate-indicted-murder-17-year-old-victim-kissena-park-queens); Allie Griffin, *MS-13 Gang Associate Indicted for 2018 Murder of 17-Year-Old in Flushing's Kissena Park,* Jackson Heights Post (March 26, 2021)(same) (https://jacksonheightspost.com/ms-13-gang-associate-indicted-for-2018-murder-of-17-year-old-in-flushings-kissena-park) (each last visited June 4, 2024). The Government's key cooperator explained that "the penalty for betraying MS-13 is death." F. at 18-19. As he advocated a life sentence for the fatherless young man who was tripped up by the same hurdles his own son had only recently cleared, even Edgar Peralta, the victim's father, echoed the official's assessment, "they can be in a gang because they cannot be men by themselves. And I hope God protects these young men…" P. 27.

Recently, in the context of adjudicating a motion for a sentence reduction under the First Step Act in United States v. Ramsay, 538 F.Supp.3d 407, 415 (S.D.N.Y. 2021), Judge Rakoff, "as a matter of first impression" analyzed whether it was proper for " [re]sentencing courts to consider an adolescent offender's immaturity, susceptibility, salvageability, and dependency." In circumstances where a bullied teen immigrant turned gangster committed murder by following an adult leader's orders to fire randomly into a crowd, he held that it did. See id. at 411-12, 424. Surveying Supreme Court opinions that touched on the subject, Judge Rakoff found that the Court had "recognized that the Eighth Amendment compels sentencing courts to consider offenders' relative youth when determining whether especially severe sentences can and should be imposed. United States v. Ramsay, 538 F.Supp.3d 407, 415 (S.D.N.Y. 2021). In several cases since the 1980s, the Court has held, based on "the evolving standards of decency that mark the progress of a maturing society," Roper v. Simmons, 543 U.S. 551, 561 (2005), that "youth matters in sentencing." Jones v. Mississippi, 593 U.S. 98, 106 (2021).

"[L]ess culpability should attach to a crime committed by a juvenile than to a comparable crime committed by an adult." Thompson v. Oklahoma, 487 U.S. 815, 835 (1988) (plurality). "The basis for this conclusion is too obvious to require extended explanation. Inexperience, less education, and less intelligence make the teenager less able to evaluate the consequences of his or her conduct while at the same time he or she is much more apt to be motivated by mere emotion or peer pressure than is an adult. The reasons why juveniles are not trusted with the privileges and responsibilities of an adult also explain why their irresponsible conduct is not as morally reprehensible as that of an adult." Id.

Synthesizing the opinions in *Thompson, Roper,* Graham v. Florida, 560 U.S. 48, 74 (2010) and Miller v. Alabama, 567 U.S. 460 (2012), Judge Rakoff found four traits distinguishing adults from adolescents: youthful offenders' immaturity, susceptibility, salvageability, and dependence. Ramsay, 538 F.Supp.3d 407, 416-17 & n.s 8-10 (citations omitted). "The first hallmark of adolescence that sentencing courts should consider is adolescents' immaturity." Id. at 417. "A lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the young. These qualities often result in impetuous and ill-considered actions and decisions." Id. (citing Roper, 543 U.S. at 569). "[J]uveniles are more vulnerable or susceptible to negative influences and outside pressures, including peer pressure." Id. at 821 (citing Roper, 543 U.S. at 569). Indeed, "[o]ne of the hallmarks of adolescent risk taking is that it is much more likely than

RICHARD PALMA
ATTORNEY AT LAW

**Page 13**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

that of adults to occur in the presence of peers". Fortunately it is a "transitory, age-linked phenomenon." Id. Because "the character of a juvenile is not as well formed as that of an adult" and the "personality traits of juveniles are more transitory, less fixed," juveniles "struggle to define their identity" decreases the likelihood "that even a heinous crime committed by a juvenile is evidence of irretrievably depraved character." Id. at 822 (citing Roper, 543 U.S. at 570). [R]elative to adults' crimes, adolescents' crimes are less a product of their choices and more a product of their environment." Id. at 822.

Extrapolating from these holdings and the neuroscience underlying them, Judge Rakoff opined:

> The need for "just punishment" corresponds to the moral culpability of an offense. Adolescents' immaturity, their susceptibility to peer influence, and their dependence mean "their irresponsible conduct is not as morally reprehensible as that of an adult." Roper, 543 U.S. at 570 (internal quotation marks omitted). Thus, a "just punishment" for an adolescent is usually less severe than a "just punishment" for a similarly situated adult.

> Youths' immaturity -- particularly in the context of "hot cognition" decisions made in the presence of peers -- also lessens the value of deterrence because adolescents' "immaturity, recklessness, and impetuosity make them less likely to consider potential punishment." Miller, 567 U.S. at 472.

> The need to incapacitate also applies with less force to younger offenders because, as noted, adolescent crime is a poor predictor of future criminal behavior, both because adolescents' characters are still developing and because adolescent crime is attributable, in part, to temporary inadequacies of the adolescent brain.

> Finally, rehabilitation is one of the congressionally enumerated goals of criminal sentencing, and adolescents' slow but steady development of means of self-control make rehabilitation and successful reintegration into society more likely than for similarly situated adult offenders. Moreover, Congress has "recogniz[ed] that imprisonment is not an appropriate means of promoting correction and rehabilitation." 18 U.S.C. § 3582(a).

> For all these reasons, to impose a sentence that is "sufficient, but not greater than necessary," sentencing courts should generally impose lesser sentences on adolescent offenders than on similarly situated adult offenders. And this also means that courts cannot simply treat anyone over 18 as an "adult" for sentencing purposes but must inquire whether the human being they are about to sentence is still in many respects an adolescent.

United States v. Ramsay, 538 F.Supp.3d 407, 423- (S.D.N.Y. 2021).

The same rationale should reign here. None having either preceded or succeeded his participation in Peralta's murder, there is no suggestion that, absent Flores-Mejia's influence, Amaya-Ramirez had any penchant for violence. Neither do any of his subsequent acts undermine his contention that his motivation in agreeing to participate was to support and protect

**Page 14**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

Carranza.  The facts make apparent that Amaya-Ramirez's actions were done to appease his partner and peers.  He should be sentenced accordingly.

As set forth in the PSR at ¶¶ 110-144 and defense Ex. G, Mitigation Report, his history and characteristics depict a fourth-grade-educated functionally illiterate solely-Spanish-speaking 27-year-old undocumented Salvadoran immigrant who, motivated to make amends for all the mistreatment the women in his life suffered at the hands of malicious men, made the fatal misstep of supporting his first girlfriend unconditionally. PSR at ¶¶ 117, 120, 138-39.  The middle of three children borne to a sexually-, physically- and psychologically abusive alcoholic father and his self-sacrificing principal victim, Amaya-Ramirez was raised rurally in true deprivation. Id. at ¶¶ 111-115.   The misogyny he witnessed clearly contributed to his unquestioning loyalty to Leyla in her murderous misadventure.    Id. at ¶¶ 122.

Amaya-Ramirez is a first-time offender whose criminality is clearly an aberration in an otherwise law-abiding life.  Id.   He has exhibited consistent industry since his arrival as a teenager in the U.S., even after the crime and his purported affiliation with MS-13. PSR at ¶¶ 119, 140.  That pattern has persisted throughout his detention, during which he has garnered uniformly "outstanding" reviews for his two-plus years as a maintenance worker and completed BOP courses in anger management, parenting, budgeting and financial responsibility.  He has likewise demonstrated mastery of assorted fitness activities.

While the Government argues otherwise, the evidence makes clear that Amaya-Ramirez is the least culpable of his codefendants.  The Court will recall that Carranza needed no coaxing and showed no deference to Amaya-Ramirez before agreeing to become a coconspirator.  She likewise had the wherewithal to seize Peralta's phone and erase all evidence of her critical role. As the Court opined in sentencing her, had she not agreed to help Flores-Mejia and Lazo-Villa, the crime never would have happened.  Ex I, Carranza Sentencing Tr. p. 48.

To be sure, the choice Amaya-Ramirez made was catastrophic, but, rather than by any misanthropic malice, it was motivated by his desire to do for his girlfriend who no man had ever done for his mother or sisters, support her choices, consequences be damned.
The shock of Peralta's death having revived repressed memories of his father's undeserved brutality, Amaya-Ramirez foreswore further criminality and devoted himself to his son and family.  Compelled now to learn his lesson the hardest way, the destined-to-be deported Amaya-Ramirez, seems little threat to commit further crimes. 18 U.S.C. § 3553(a)(2)(B-C).

While it is hard to discern the precise role the similarly situated defendants played in the MS-13-motivated murders for which they were convicted, the mean sentence for a first offender convicted of a single act appears to be 25 years in this district.  See Ex. H, MS-13 Sentencing Table.  Your Honor sentenced Carranza to 22 years, which she is currently serving in safe low security Aliceville.  In imposing that sentence, the Court recognized that, save for her participation, Andy Peralta would still be alive.

It is Amaya-Ramirez's hope that Your Honor can in good conscience impose the far-greater-than-necessary yet minimum-possible 30-year term here, a sentence he's destined to serve in a maximum-security setting certain to be beset by gang violence.  See 18 U.S.C. §

**Page 15**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

3553(a)(6).  Considered collectively, Amaya-Ramirez's acceptance of responsibility, remorse, industry and devotion to family demonstrate that rehabilitation is well under way and, especially with deportation a certainty, that future criminality is extraordinarily *un*likely.  They likewise suggest that a bottom-of-the-elevated guideline sentence would neither deprecate the seriousness of the offense nor undermine respect for the law and would therefore be just.  18 U.S.C. § 3553(a)(2)(A).

E.      Amaya-Ramirez Is Destined To Serve His Sentences Under Conditions Far
        More Onerous Than In Typical Times.

        In the belief that "it should not rise to the level of punishment" but often does, many courts have cited the severity of pretrial incarceration as justification for downwardly departing from a guidelines range.  See United States v. Behr, 2006 WL 1586563 at 5 (S.D.N.Y. June 9, 2006) (citing Bell v. Wolfish, 441 U.S. 520, 537-38 (1979); United States v. Gallo, 653 F.Supp. 320, 336 (E.D.N.Y.1986) (noting that "[t]he inevitable consequences of pretrial incarceration, particularly when prolonged beyond a short period, are undeniably severe.").

        Finding them "materially different than [time] served at a jail or prison elsewhere in the United States v. Colucci, No. 23 Cr. 417, 2024 WL 3643857, at *7 (E.D.N.Y. Aug. 5, 2024) courts in this Circuit have repeatedly recognized and condemned the harsh conditions at the area's jails, conditions which include perpetual lockdowns, inadequate medical care, and staggering violence that "make time spent there essentially the equivalent of either time and a half or two times what would ordinarily be served."  United States v. Nunez, 2024 WL 4504493 at 6 (S.D.N.Y. October 16, 2024).

        The conditions at both Bergen County Jail and MDC, where Amaya-Ramirez has been serially housed in the almost 6-years since October 28, 2019 arrest, through the COVID pandemic and personal infection, are, by all accounts, deplorable, and thus far more punitive than rehabilitative.   See, e.g. Dana Difilippo, *County jail conditions — 'hazardous even to a dog' — spur calls for independent oversight: Watchdogs warn state inspections of county jails don't provide true picture of what happens behind bars*, New Jersey Monitor (January 22, 2024) https://newjerseymonitor.com/2024/01/22/county-jail-conditions-hazardous-even-to-a-dog-spur-calls-for-independent-oversight/ (last visited March 12, 2025); Nicholas Katzban, *Police union votes no confidence in Essex County Jail head, county administrators,* Bergen Record (August 16, 2024)(" Among the union's complaints are staffing shortages that leave supervising officers stretched thin and requires inmates to spend the majority of their time in their cells, known as a 'Restricted Access Schedule.' The unnecessary confinement foments violence between inmates and officers and between the detainees themselves, supervisors claim." (https://www.northjersey.com/story/news/essex/2024/08/16/police-union-vote-no-confidence-essex-county-nj-jail/74805133007/ )(last visited March 13, 2025);

        Neither can those contemptible conditions be expected to improve going forward under an Administration that values ideology, obsequiousness, dollars, pulchritude - just about

RICHARD PALMA
ATTORNEY AT LAW

**Page 16**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

everything - over competence and for whom prisoners, save for favored fraudsters and insurrectionist fellow travelers, are hardly a priority.  See, e.g. Walter Pavlo, *Bureau Of Prisons Director William Marshall Addresses Challenges*, Forbes July 2, 2025 (In June 2025, a federal judge issued a preliminary injunction blocking the enforcement of a Trump executive order ending collective bargaining for BOP employees.  Newly appointed Bureau of Prisons (BOP) Director William Marshall III

inherited a BOP office in disarray and void of leadership.  Two major issues facing the BOP have been its crumbling infrastructure and hiring to fill thousands of open positions. Marshall said that the Agency is going to change for the better and there is always reluctance to any change. "Staff have to ask themselves, 'Is this where I want to be?'")
https://www.forbes.com/sites/walterpavlo/2025/06/30/exclusive-interview-with-bureau-of-prisons-director-william-marshall/
Beth Schwartzapfel & Christie Thompson*, Trump's Union Order Endangers Federal Prison Officers, Labor Leaders Say*, The Marshall Project, March 31, 2025 (Federal prison employees are bracing themselves for a legal fight, after President Donald Trump signed an executive order last week to. Labor leaders say the order is devastating for the bureau, seeking to silence a union representing over 30,000 people at more than 120 federal prisons nationwide." "The executive order … comes at a time when federal prisons are facing unprecedented uncertainty. At least six top officials left the agency since Trump's ascension, and there was no acting director or deputy director until recently. The agency's reputation has suffered in recent years as details have emerged of crumbling infrastructure and numerous incidents of staff members beating and sexually assaulting prisoners.")   (https://www.themarshallproject.org/2025/03/31/trump-union-executive-order-prisons?utm_campaign=opening-statement&utm_medium=email&utm_source=newsletter&utm_term=3992-making-federal-prisons-worse); Walter Pavlo, *Bureau Of Prisons Executives Announce Retirement Ahead Of New Director*, Forbes, Feb 17, 2025 ("The Federal Bureau of Prisons is currently experiencing significant upheaval, with a wave of leadership resignations leaving the agency without clear direction during a critical time." Widespread resignations following uncertainty over the Government's severance offer and ongoing hiring freezes has compounded these difficulties. This mass exodus has left the BOP rudderless, grappling with pre-existing operational challenges exacerbated by the sudden leadership vacuum. As the agency faces increasing pressure to perform amid significant policy shifts, uncertainty looms over its future.);Walter Pavlo, *Confusion And Anger At Bureau Of Prisons Over OPM Memos,* Prisonology (February 2, 2025) https://www.prisonology.com/blog/confusion-and-anger-at-bureau-of-prisons-over-opm-memos (last visited March 14, 2025);  *Federal Bureau Of Prisons Facing Major Challenges Amid Leadership Overhaul*, Crime and Justice News (Feb 19, 2025)("Among the challenges faced by BOP are severe staff shortages, crumbling infrastructure, insufficient halfway house capacity, and rising medical care costs for inmates. The agency is also struggling to consistently implement two critical pieces of legislation: the First Step Act and the Second Chance Act, both of which were designed to reduce recidivism and help prisoners reintegrate into society. Attorney General Pam Bondi has acknowledged the urgency of the situation, declaring that addressing issues within the BOP is a top priority.  However, in the absence of a permanent director, her office has been issuing memos directly to frontline staff, leading to confusion and further uncertainty.)

**Page 17**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

https://www.ncja.org/crimeandjusticenews/federal-bureau-of-prisons-facing-major-challenges-amid-leadership-overhaul (last visited March 14, 2025).

Extrapolating from the way it has treated even the children of immigrants, there is every reason to believe that incarceration in Trump term two will fall little short of torture. We can expect pandemic-like conditions with long program-less lockdowns, increased violence, neglect of medical needs, little family contact and high anxiety. See, e.g., *Union Calls on Trump Administration to Reverse Pay Cuts for Federal Correctional Officers and Staff*, Prisonology (February 26, 2025) ("The Bureau of Prisons verbally notified employees across the country yesterday that it was reducing or eliminating the special recruitment and retention pay that has been paid to officers and staff at many federal facilities to help address dangerous understaffing levels. The retention pay adds between 10% and 25% to an employee's salary." The American Federation of Government Employees says those "will exacerbate staffing shortages and make working conditions less safe."). Walter Pavlo, *The Bureau Of Prisons Under A Trump Administration*, Forbes, (Nov 06, 2024). (https://www.forbes.com/sites/walterpavlo/2024/11/06/the-bureau-of-prisons-under-a-trump-administration/); Shannon Heffernan, *How Trump Is Trying to Expand the Already Colossal U.S. Prison System*, The Marshall Project (February 15, 2025) ("ICE has also begun sending some detainees to the federal Bureau of Prisons. But the BOP was already in crisis before Trump took office, as described by the Justice Department's Office of the Inspector General. The low ratio of staff to incarcerated people has left the BOP struggling to provide security and basic services to the people imprisoned in its facilities, putting their safety — and that of employees — at risk.")

Even before the implementation of Trump's trumpeted budget cuts, Amaya- Ramirez has already suffered an untreated fractured disc, PSR at ¶ 126 an untreated broken wrist, id. at ¶¶ 127-28, untreated leg and knee problems, id. at ¶¶ 129-30, and untreated insomnia and anxiety. PSR. at ¶¶ 134

To compensate for that incipient systemic psychological stress and physical deprivation, a conscientious court might impose a lower sentence than it would have in less turbulent and uncertain times. That Amaya-Ramirez has already been subject to substantial suffering might make the Court more comfortable imposing the minimum sentence.

E.  The Court Should Credit Amaya-Ramirez for the Time He Spent in ICE Custody

Section 3585(b) provides, in pertinent part that "[a] defendant shall be given credit toward the service of a term of imprisonment for any time spent in official detention prior to the date the sentence commences." United States v. Cheng, 763 F. App'x 85, 88 (2d Cir. 2019)(quoting 18 U.S.C. § 3585). A defendant is entitled to credit toward his criminal sentence for any period spent in immigration detention pending *potential* criminal prosecution. Zavala v. Ives, 785 F.3d 367, 377 (9th Cir. 2015)(emphasis added).

However, BOP policy on the subject presents a potential problem. Program Statement 5880.28, explicitly excludes time spent in the custody of the U.S. Immigration and

RICHARD PALMA
ATTORNEY AT LAW

**Page 18**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

Naturalization Service "pending a final determination of deportability" from the definition of "official detention."  Id. at 89 (citing BOP P.S. 5880.28, 1-15A.)

While the PSR reports his arrest date as May 15, 2020, NYPD officers first arrested Amaya-Ramirez on October 28, 2019, well into the Government's investigation of the Peralta murder, at which point he was placed in ICE detention in Bergen County Jail.  The Government can speak more authoritatively on the subject, but it is Amaya-Ramirez's belief that he had by then been identified as a target of the Peralta investigation and his initial arrest was pretextual. See, Ex. J, Complaint, 20-MJ-347, p. 6, ¶12 (Cooperating Witness #1 informed law enforcement of Amaya-Ramirez before his October 28, 2019 arrest).

To avoid any adverse administrative conclusion here, Amaya-Ramirez seeks a ruling on the record, preceded by any necessary fact finding, that from the time of his October 2019 arrest, he was facing potential prosecution for the Peralta murder and thus deserves credit for the 201 days from October 28, 2019 to May 15, 2020.

F.  Placement

"[A] court may make a recommendation concerning the type of prison facility appropriate for the defendant; and in this calculus, the presence of a rehabilitation program may make one facility more appropriate than another." United States v. Crum, 843 Fed.Appx. 404, 2006 WL 1976165 (2d Cir. 2021)(citing Tapia v. United States, 564 U.S. at 334 (2011).   § 3621(b)(4)(B) does require the Bureau of Prisons ("BOP") to consider a district court's designation recommendation, among other factors, in discharging its responsibility for designating convicted federal defendants to appropriate penal facilities.

Because BOP nevertheless makes every effort to respect a district court's recommendations,  Amaya-Ramirez requests that the Court recommend placement in BOP's Northeast Region, near his son. See 18 U.S.C. § 3621 (b)(4)(B); Bureau of Prisons Program Statements PS 5140.28 and PS 5070.10 § 7 (a) & (b); United States v. Potoski, 2010 WL 1909551 (09-0176-cr 2d Cir. May 13, 2010) (sentencing court may recommend place of imprisonment) (citing United States v. Yousef, 327 F3d 56, 165 (2d Cir. 2003)); Woodall v. Federal Bureau of Prisons, 432 F.3d 235 (3d Cir. 2005) (same).

**Page 19**
**Letter to Hon. DeArcy Hall, USDJ**
**July 25, 2025**

G.    Conclusion

Like Leyla Carranza, Amaya-Ramirez is destined to be deported.  Arguably, Carranza was more necessary to the conspiracy's objective.  For this reason, and all the foregoing, we respectfully ask that he receive a sentence of 30-years.


Respectfully submitted,

*Richard Palma*

Richard Palma

cc: AUSAs Jonathan Siegel and Anna Karamigios
    USPO Cheyanne Ralph
Attachments: Exhibits A – J.

RICHARD PALMA
ATTORNEY AT LAW